FARMERS' BANK OF CONCORDIA, *Appellant*, v. WORTHINGTON *et al.*

Division One, June 22, 1898.

1. **Fraudulent Conveyances**: LACK OF KNOWLEDGE IN GRANTEE. Although the grantor has been guilty of fraud in conveying his land, and the evidence plainly shows that he did so for the purpose of hindering and delaying and defrauding plaintiff, yet if his grantee had no knowledge of his fraudulent purposes and acts, and paid a valuable consideration for the land, the deed can not be set aside.

2. ———: ALLEGED FRAUD: BURDEN OF PROOF. Where a petition alleges that a conveyance was voluntary, without consideration notwithstanding the recitals in the deed, and was made by the grantor to hinder, delay and defraud his creditors, and that the grantee knew that intent and participated in the fraud, the burden of proving all these things rests on the plaintiff.

3. ———: FRAUD: NECESSARY PROOF. While fraud may be deduced from the circumstances of the case and the acts of the parties, yet mere suspicion is not sufficient, nor can it be presumed, but must be established as an affirmative fact; and if they consist as well with honesty as with fraud, the transaction should be held honest.

4. ———: PRACTICE: FAILURE TO CALL WITNESS: PRESUMPTION. The circumstance that a particular person who is equally within the control of both parties is not called as a witness, lays no ground for any presumption against either. (Following *Kerstner v. Vorweg*, 130 Mo. 196).

5. ———: SUPPLYING BLANKS IN DEED. Where a deed is executed and delivered in blank, with parol authority to fill the blanks with the name of the grantee and the amount of the consideration, the grantee, whose name is afterward inserted, takes good title. And especially is this true where the deed is subsequently re-acknowledged.

*Appeal from Lafayette Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED.

*Wallace* and *Chiles* for appellant.

(1) The deeds complained of should have been set aside for fraud proven, and because made without consideration. The evidence offered by appellant disproves the payments claimed to have been made therefor by respondent Youngs, and the appellant should have recovered on the weight of the evidence. *Burgert v. Borchert*, 59 Mo. 83; *Cass Co. v. Green*, 66 Mo. 510; *Benne v. Schnecko*, 100 Mo. 250. (2) Appellant should have recovered judgment on the circumstantial evidence, and the inferences arising from circumstances proven, pointing directly to the fact that these conveyances were fraudulent and voluntary. *Hopkins v.*

*Sievert*, 58 Mo. 201; *Burgert v. Borchert*, 59 Mo. 80; *Crow v. Beardsley*, 68 Mo. 435; *Massey v. Young*, 73 Mo. 260; *Rupe v. Alkire*, 77 Mo. 641; *Alberger v. White*, 117 Mo. 347; *State ex rel. v. Purcell*, 131 Mo. 312. (3) Appellant should have recovered on the facts, and the failure of respondents to produce as witnesses his partners in the fraud, and other evidence to corroborate him, which was in his power, if there was such. *Henderson v. Henderson*, 55 Mo. 534; *Cass Co. v. Green*, 66 Mo. 498; *Baldwin v. Whitcomb*, 71 Mo. 651; *Benne v. Schnecko*, 100 Mo. 250. (4) The burden of proof was on respondents, on the question of innocent purchaser, and not on appellant. *Holdsworth v. Shannon*, 113 Mo. 508; *Ins. Co. v. Smith*, 117 Mo. 261; *Garrett v. Wagner*, 125 Mo. 450; *Potter v. McDowell*, 31 Mo. 62; *White v. McPheeters*, 75 Mo. 286; *Walsh v. Ketchum*, 84 Mo. 427. (5) The alteration made in the deeds after signing and acknowledgment by respondent Youngs, or for him, was a fraud at law, and invalidated the instruments. *Haskell v. Champion*, 30 Mo. 136; *Hord v. Taubman*, 79 Mo. 101; *Bank v. Frick*, 75 Mo. 178.

*Alexander Graves* and *John Welborn* for respondents.

(1) The burden of proof is upon the appellant to prove the charge in the petition that Worthington conveyed the land with the intent to defraud his creditors and that Youngs knew of such fraudulent intent when he purchased the land, or was possessed of such facts as from them his knowledge of such fraudulent intent may reasonably be inferred and that he participated therein. *Hill v. Taylor*, 125 Mo. 342; *Robinson v. Dryden*, 118 Mo. 539; *Ettlinger v. Kahn*, 134 Mo. 498; *Martin v. Estes*, 132 Mo. 409; *Kerstner v. Vorweg*, 130 Mo. 201; *Doughtery v. Cooper*, 77 Mo 528; *Garsche v.*

*McDonald*, 103 Mo. 1; *Warren v. Ritchie*, 128 Mo. 319; *Chapman v. McIlwrath*, 77 Mo. 44; *Dallam v. Renshaw*, 26 Mo. 533; *Bobb v. Woodward*, 50 Mo. 101; *King v. Isley*, 116 Mo. 159. (2) Worthington was dead when the present suit was begun, and his wife has been non-resident during all the litigation. They have no interest in common with Youngs in this litigation, are no kin to Youngs and are as much within appellant's control as that of Youngs. *Kerstner v. Vorweg*, 130 Mo. 201; *Scoville v. Baldwin*, 27 Conn, 318; *Bent v. Lewis*, 88 Mo. 470. (3) Welborn's evidence shows that he wrote the deeds and that the insertions of the name of the grantee and the consideration were made before acknowledgment and delivery. Youngs was not interrogated on the point. Again, Worthington, the other party to the deeds (or his privies), is the only person who could raise the point and not appellant who is a stranger to the instrument.

MARSHALL, J.—This is a proceeding in equity to declare void certain conveyances of real estate in Lafayette county, from Joab Worthington to Joseph L. Youngs, and to subject the same to the payment of the plaintiff's judgment.

The facts essential to the determination of the case are these: Prior to April, 1893, Joab Worthington owned one hundred and fifty-seven and four-fifths acres of land, worth $40 an acre. He was reputed and believed to be solvent and his credit was good. On the eighteenth day of April, 1893, he indorsed a note for $1,550, made by his son-in-law Brown to the plaintiff, payable six months after date. On the twenty-seventh of April, 1893, he indorsed a similar note for $500, payable at five months after date, and on the twenty-eighth of June he indorsed another like note for $500,

payable at six months.   Brown was worth but little and his credit was not good.

On the fifteenth of November, 1893, Worthington conveyed fifty-seven and four-fifths acres of land to his attorney John Welborn, who at the same time conveyed it to Eliza J. Worthington, Joab's wife.   There was no consideration for this transfer and its purpose is admitted to have been to vest the title in Mrs. Worthington.

On the seventeenth of November, 1893, Joab Worthington went to the bank and informed its officers that Brown was not able to pay his note, and proposed to deed to the bank sixty acres of his land in discharge of his and Brown's indebtedness of $2,550 to the bank. Two of the directors of the bank went to see the land that day to decide as to whether the bank would accept the proposition.   When they reached the place Worthington withdrew his proposition, but proposed to let the bank have the sixty acres for $2,800, and to apply $2,550 in discharge of the debt and pay him the difference.   The directors arranged to meet him the next day to determine the proposition.   Worthington did not keep the engagement; so the bank brought suit that day on the two notes first described, had the summons served on Brown at once, and on Worthington about 10 o'clock that night.

On the seventeenth or eighteenth of November, 1893, Youngs and Worthington met at Aullville and rode home together.   Youngs had been trying for several years to buy Worthington's land, but was willing to give only $40 an acre, while Worthington demanded $50.   Worthington owed Youngs about $1,500, and while riding homeward Youngs told Worthington he had heard that he (Worthington) had deeded a part of his land to his wife, and that he (Youngs) wanted a deed of trust to secure his debt.   Worthing-

ton refused to give the security but proposed to sell him the whole farm for $40 an acre, and asked him (Youngs) to go to Lexington the next day and complete the transaction. Youngs declined to go until the following Monday. On that day the parties met at Welborn's office, and after he had examined the title he drew two deeds, one for fifty-seven and four-fifths acres, and the other for one hundred and fifty-seven and four-fifths acres, the consideration expressed being $6,280 in each. Youngs surrendered to Worthington his three notes, aggregating $1,500, paid him $2,500 in cash, and gave him two notes, one for $1,200 at thirty days, and one for $1,080 at sixty days.

On the twenty-seventh of December, 1893, plaintiff obtained against Brown and Worthington, a judgment on the two notes previously sued on, and on the twenty-seventh of January, 1894, instituted suit against Worthington and wife, Welborn and Youngs to set aside the conveyances and subject the land to the payment of its debt. On the fourth of April, plaintiff obtained judgment on the third note described. The equity case was tried in July, 1894, and it appeared that the three notes amounting to $1,500 Youngs held against Worthington were for borrowed money; that the $2,500 cash paid, was made up of $1,600 Youngs had on hand in his home, cash accumulated from the sale of cattle since the July previous, and $900 he borrowed from his son Elmer, who was also a farmer and stock dealer; that the notes for $1,200 at thirty days and $1,080 at sixty days were paid at or before maturity, before the institution of that suit, and before Youngs knew that Worthington was indebted to the bank. Upon this showing the plaintiff took a voluntary nonsuit, but immediately instituted this suit, having a like purpose. Joab Worthington and wife, in the meantime, had removed from this State and before

service was had, Joab died and his heirs were made
parties to this suit.   The answer of Youngs admits the
purchase, denies the allegations of fraud .and sets up
that he purchased the property in good faith and for a
valuable consideration.   Welborn admits the convey-
ance from Joab Worthington to him, and by him to
Eliza Worthington, was without consideration and for
the purpose of vesting the title in Eliza J. Worthing-
ton.   The other defendants made default.   Upon the
trial, in addition to the facts above stated, the plaintiff
showed by the testimony of the shipping master of the
Kansas City Stock yards, and by that of the book-
keepers of two firms of stock dealers in that city, that
between October 1, 1893, and April 1, 1894, Joseph L.
Youngs' and Elmer E. Youngs' stock dealings in Kan-
sas City, were as follows: Elmer Youngs, October 20,
1893, one car load seventy-two hogs, $822.27 of which
he drew $10 cash, and balance was sent to American
Bank, in Higginsville; December 14, 1894, one car six-
teen cattle for Elmer and two cars thirty-eight cattle
for Joseph, $1,807.93, of which Elmer drew $25 and
the balance was sent to American Bank, at Higgins-
ville; January 29, 1894, seventy-three hogs, $847, of
which Elmer drew $25, and balance was remitted to
the same bank; February 1, 1894, eighteen cattle and
three hogs, $601.68, of which Elmer drew $10, and the
balance was remitted to the same bank; March 13,
1894, fifty-nine hogs, account Joseph, $596.05, remit-
ted to same bank; that the books of the bank showed
that all of these amounts except the last, were credited
to Elmer.   The evidence further showed that the cat-
tle of Joseph and Elmer were sometimes billed in one
name and sometimes in another.   The returns for taxa-
tion made by Joseph for the years 1891, 1892 and 1893,
showed no solvent unsecured notes and no money on
        VOL. 145 mo—7

hand or on deposit. The return for 1893, showed he owned seventeen hogs and thirty-six cattle. The evidence further showed that in 1889 Joseph gave a deed of trust on other land to secure the payment of $2,500 purchase money therefor and paid the same April 28, and June 9, 1894, and that on June 19, 1894, he borrowed of Judge Richard Field $1,500, payable at two years, and secured it by deed of trust, and that in September, 1893, he borrowed $1,500 from A. Wade, secured it by deed of trust, and paid it seven or eight months later. It further appeared that on March 8, 1890, Elmer borrowed $2,484.30 from his father, Joseph, at two years, and secured it with his land, which he afterward paid. Joseph explained his having $1,600 in cash in his house, by saying that he had been trying and expecting to buy the Anson farm, in his neighborhood, which would cost $2,400 in cash, and he had been saving money for that purpose.

Appellant showed that the name of the grantee and the consideration in both the deeds from the Worthingtons to Youngs were written in different ink from the remainder of these instruments, and contends that they were materially altered after delivery.

The circuit court dismissed the bill and plaintiff appealed.

I. Upon this showing the fraud of Joab Worthington is boldly apparent. His upright life and business integrity doubtless prompted his visit to the bank and his theretofore unsuspected honesty suggested the plan of turning over sixty acres of his land to the bank in payment of his debt. True, he concealed or failed to disclose to the bank that two days before that time he had, by mesne conveyances, transferred about a third of his land to his wife. But even that would not have been fraudulent, as the one hundred acres he still owned, valued at only $40 an acre, was more than sufficient to

pay the $2,500 he owed the bank. For some unexplained reason, however, he receded from his manly proposition, and when the directors of the bank called to see the land the same day, he wanted $2,800 for it. Whether this was because he figured that his first proposition was on a basis of only a fraction over $40 an acre, while he had been asking $50 an acre for it, and he therefore raised his price to $46.66⅔ per acre, will, probably, never be known. It is clear, however, that the next day when Youngs, who had loaned him $1,500 without security, spoke to him about having transferred a part of his property to his wife and demanded security for his debt, he refused to give the security, but agreed to sell the whole farm for $40 an acre. These facts make it clear that he realized that a crisis had arisen in his financial affairs, and instead of meeting it like a man, he took the way his long life of probity should have scorned. At $40 an acre, his property was worth $6,312. He only owed the bank $2,550 and Youngs $1,500, aggregating $4,050, and some interest. He could have paid this and had $2,262 left, and have retained the respect and gained the sympathy of the community. Instead of doing this he sold the whole farm to Youngs for $6,280, that is one hundred and fifty-seven and four-fifths acres at $40 per acre, (exclusive of the value of the four-fifths of an acre), allowed Youngs $1,500 he owed him, put the balance of $4,780 in his pocket, left the State, and paid the bank nothing. The paths that lead to fraud are devious and sometimes not easily followed, but in this case Worthington's foot-prints all point in one direction.

But, however clear Worthington's fraud may be, the conveyances can not be declared fraudulent, unless Youngs knew of Worthington's intent to defraud his creditors and participated in it. *Van Raalte v. Harrington*, 101 Mo. 602; *Nat. Tube Works Co. v. Machine*

*Co.*, 118 Mo. 365; *Robinson v. Dryden*, 118 Mo. *l. c.* 539; *Martin v. Estes*, 132 Mo. *l. c.* 409; *Ettlinger v. Kahn*, 134 Mo. 492. The petition alleged that the transfer to Youngs was voluntary, without any consideration, notwithstanding the recitals of the deeds, and was made by Worthington to hinder, delay and defraud his creditors, and that Youngs knew that intent and participated in the fraud. Youngs answer denied notice, set up his *bona fides* and averred the truth of the expressed consideration in the deeds. Thus fraud on the part of the grantor and grantee was affirmed by the plaintiff. The burden of proving it therefore rested upon the plaintiff. *Sutter, Adm'r, v. Lackmann*, 39 Mo. 91; *Albert v. Besel*, 88 Mo. *l. c.* 153; *Hazell v. Bank*, 95 Mo. 60; *Van Raalte v. Harrington*, 101 Mo. *l. c.* 611; *State ex rel. v. Hope*, 102 Mo. 410; *Robinson v. Dryden*, 118 Mo. *l. c.* 539; *Kerstner v. Vorweg*, 130 Mo. *l. c.* 201; *Ettlinger v. Kahn*, 134. Mo. *l. c.* 498; *Mansur-Tebbetts Co. v. Ritchie*, 143 Mo. *l. c.* 611. Fraud can rarely be proved by direct evidence. It is most frequently to be deduced from the circumstances surrounding the transaction and from the acts of the parties. Mere suspicion is not, however, sufficient. The fraud must be proved as an affirmative fact, and the proof must be of such a positive and definite character as to convince the mind of the chancellor, for it is never presumed, and if the facts shown all consist as well with honesty as with fraud, the transaction should be held honest. *Dallam v. Renshaw*, 26 Mo. 533; *Chapman v. McIlwrath*, 77 Mo. 38; *Robinson v. Dryden*, 118 Mo. *l. c.* 539. Learning of the transfer to his wife, Youngs had a right to demand security from Worthington for his debt, and when Worthington refused to give the security but offered to sell the whole farm at the price Youngs had long been trying to get it, he had a right

to buy it, using the the debt from Worthington to him as a part payment. The evidence is uncontradicted that Youngs did not know Worthington owed the bank anything, and that he never heard of that fact until the twenty-seventh of January, 1894, when the first suit to set aside the deeds to him was instituted, and about a week before that time he had paid the sixty day note for $1,080, the last payment of the purchase price of the land. He can not, therefore, be said to have had actual notice of any fraudulent intent on the part of Worthington. The plaintiff can not reasonably contend that the price Youngs paid for the land was inadequate or indicative of fraud, for when Worthington offered it sixty acres at the same price in payment of his debt, it would not accept it without first sending two of its directors to investigate the value of the land. The only evidence that the land was worth more than $40 an acre, is that Worthington asked Youngs $50 an acre for it and that he wanted $46.66⅔ an acre for it from the bank on the same day he had offered it to the bank for about $40 an acre. There is no evidence that it was worth $50 an acre. The price paid by Youngs for it was therefore reasonable and no presumptions can attach to that fact.

Plaintiff's main contention seems to be that it is so highly improbable that Youngs had $1,600 in cash in his house or that his son had $900 in cash in his house, that a presumption of fraud flows from such statements of Youngs. Standing alone it is not evidence of fraud. We do not know judicially where people keep their cash. Generally, it is considered safe to deposit all over that needed for immediate use, in a bank or in some safe depository. But even that is not always safe. Even banks sometimes fail. Youngs statement is uncontradicted that he intended buying the Anson farm, if he could not get Worthington's, and that he kept this

money separate so as to be ready to pay for it in cash. We can not overcome this positive testimony by the indulgence of suspicions.     But plaintiff couples this fact with the testimony that Youngs testified that about $1,200 of this $1,600 was derived from the sale of cattle in Kansas City, "about that time," and with the testimony obtained from the cattle dealers and others in Kansas City, that between October 1, 1893, and April 1, 1894, Youngs and his son together only shipped and sold $4,884.93 worth of cattle and hogs, and that of this amount the son drew $70 in cash, and the balance was remitted to the American Bank, of Higginsville, and entered to the credit of the son, and that Youngs return of property subject to taxation on June 1, 1893, showed only seventeen hogs and thirty-six head of cattle, and upon this the conclusion is predicated that Youngs did not tell the truth when he said he had $1,600, in cash, in the house on the twentieth of November, 1893, and hence the transfer from Worthington to him is fraudulent.     This argument overlooks some other material facts and testimony in the case. Whilst it is true that the father and son were, in this manner, shown to have sold only $4,884.93 worth of cattle and hogs in Kansas City between October 1, 1893, and April 1, 1894, it is likewise true that it appeared that Youngs had been accumulating this money from July, 1893, and the transactions between that date and October 1, 1893, were not disclosed. And while the return for taxation of property owned by him on June 1, 1893, showed only seventeen hogs and thirty-six head of cattle, still the testimony of the Kansas City dealers, introduced by plaintiff, showed that between March 1, 1893, and October 1, 1893, Youngs shipped to them and they sold for him thirty-eight head of cattle and fifty-nine hogs.     How much they realized together is not known.     It also appeared that the father and son

sometimes shipped in the name of one and sometimes in the name of the other, and that the proceeds of the sale of the hogs and cattle shipped by the father were remitted to the American Bank of Higginsville, and passed to the credit of the son. Giving these facts their fullest significance, they do not prove the falsity of Youngs statements, nor do they furnish indicia of fraud in the sale of the land. Youngs standing in the community in which he had lived for over fifty years was not attacked. He appears to be a reputable citizen, an industrious farmer, a thrifty dealer, and a man of good credit. His ability to borrow money from those among whom he lives attests his reputation for honesty, and his payment of the sums thus secured proves his business probity.

Plaintiff has embodied in the record a *fac simile* of the two notes given by Youngs for the deferred payments, and contends that they furnish evidence of fraud, in that, from their shape and contour there is not room enough for a signature to have been attached to them. There are no signatures to the reproduced notes, but the jagged appearance of the lower portions of the notes, rather conveys the impression that the name had been torn off the notes, which is not an uncommon method of mutilating a note that has been paid.

It is contended that Youngs failure to produce the testimony of Worthington "is a strong fact against him." Worthington was alive, though absent from the State, when the first case was tried, but died before service could be had upon him in this case. "Ordinarily the circumstance that a particular person who is equally within the control of both parties is not called as a witness, lays no ground for any presumption against either." *Kerstner v. Vorweg*, 130 Mo. *l. c.* 201.

Plaintiff further contends that the name of the grantee (Youngs) and the consideration, were written

in different ink from the balance of the deeds, and were put in after the deeds were executed, and that independent of the alleged fraud, the deeds should be set aside for this reason.    This contention is not tenable. Where a deed is executed and delivered in blank, with parol authority to fill the blank with the name of the grantee, the grantee whose name is afterward inserted takes a good title.    *Otis v. Browning*, 59 Mo. App. 326. And this is true though the blank was filled in the absence of the grantor.    *Field v. Stagg*, 52 Mo. 534.    The cases relied on by plaintiff were where a material change was made, without authority of the person to be charged, in a written instrument, and hence have no application here where the grantor is not complaining. Aside from this there is sufficient evidence that the deeds here in question, were afterward re-acknowledged.    Moreover no such issue was raised by the pleadings in this case.

We have thus at great length set out and reviewed the facts, circumstances and contentions in this case, and after the closest scrutiny have been unable to find any evidence of fraud, notice of fraud or participation in fraud on the part of the grantee, Youngs, and we therefore affirm the judgment of the circuit court.    All concur.