## MAURICE H. BLACK v. SIMON EPSTEIN et al.; MARCUS EPSTEIN, Appellant.

### Division Two, June 8, 1909.

1. **DEPOSITION: Witness Present.** The deposition of a party to the suit, like any other declaration against interest, may be read by his adversary as an admission, though he be present in court at the time and later testifies.

2. **————: ————: When Appellant Was Not Party.** The deposition of defendant taken at a time when another defendant had not been made a party, is competent as statements and declarations of the deponent.

3. **————: ————: Adversary's Witness.** Where plaintiff takes and reads in evidence the deposition of a defendant, who is present in court, he will not be permitted to directly impeach deponent's credibility, but it is still the right of the court and jury to weigh his deposition and other testimony and determine for themselves. whether or not he testified the truth. By reading such deposition plaintiff is not bound by deponent's statement that he honestly owed another defendant $30,000 when he gave him the deed of trust alleged to be fraudulent as to creditors.

4. **REPUTATION: Not Impeached.** In civil actions the reputation of neither party, unless assailed by the other, can be inquired into, unless put in issue by the character of the suit, such as libel, slander, malicious prosecutions, etc., in which evidence of good character is to be considered in assessing the damages. In a suit to set aside a deed of trust made by one brother to another alleged to be in fraud of plaintiff creditor, it is not for the brothers, before plaintiff attempts to impeach their reputation, to prove what it is.

5. **————: Foundation.** A witness should not be asked what the reputation of a party for fair dealing is, unless it is, first shown that the witness is acquainted with such reputation and knows it.

6. **HOMESTEAD: In Head of Family: Claimed for First Time on Appeal.** A homestead right in the head of a family is an exemption right. and differs from the homestead of the widow and minor children, which is a vested right. And where de-

Black v. Epstein.

fendant testified that his wife was dead and there is no testimony that he had any family, it cannot be held that he was the head of a family; and where he made no claim in the trial court that a part of the property covered by the deed of trust sought to be set aside as fraudulent constituted his homestead, his claim based upon such evidence asserted for the first time in his reply brief filed in this court, will be disallowed.

7. **OMITTED EVIDENCE: Affirmance: Fraudulent Conveyance.** Where the bill of exceptions does not show whether or not appellant's deposition, offered in evidence, was read, and the bill shows that it was approved by respondent's attorney, the judgment in a suit to set aside a deed of trust as being fraudulent as to creditors, will not be affirmed because said deposition is not preserved in the bill.

8. **FRAUDULENT CONVEYANCE: Preference.** A debtor, whether solvent or insolvent, may prefer one or more of his creditors, and may by any suitable means appropriate his property to the payment of the just debts of one or more of his credtors to the exclusion of all others.

9. ———: ———: **Fiduciary Relation: Inference.** The relationship of the parties and the insolvency of the grantor are not sufficient in themselves to establish fraud, but these added to other suspicious circumstances may often furnish satisfactory evidence of fraud.

10. ———: **Affirmative Proof.** Fraud can rarely be proven by direct evidence and is most frequently deduced from circumstances surrounding transactions between the parties. Mere suspicion is not sufficient. It must be proven as an affirmative fact. It is never presumed, and if the facts consist as well with honesty as with fraud, the transaction must be held honest. But fraud conceals itself; it cannot often be proved by direct evidence, but innumerable circumstances, trivial in themselves, all converging to one end, may make it indisputably apparent.

11. ———: **Sufficient Evidence.** One brother conveyed to a trustee by deed of trust, naming H. as the third party, all his property, to secure a recited note of $30,000, and H. transferred the note to the other brother, the appellant. The debtor brother had already been sued for $7,710 on other notes, upon which judgment was later obtained. It is held that the manner of the transfer indicates fraud, and all the evidence is reviewed and it is held that the one brother did not owe the other, and the deed of trust was made to defeat creditors.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

AFFIRMED.

*F. A & L. A. Wind* and *Barclay & Fauntleroy* for appellant.

(1) The court erred in admitting in evidence the deposition of defendant, because defendant was in court in person and the deposition contained no admission which tended to sustain the allegations of the bill. (2) The court erred in excluding the testimony offered as to the reputation of defendants Simon and Marcus Epstein, who were charged with having committed an actual, not a constructive fraud. Greenleaf on Evidence, sec. 54; O'Bryan v. O'Bryan, 13 Mo. 15; Bank v. Worthington, 145 Mo. 91; Miller v. Miller, 14 Mo. App. 418. (3) Under the law and evidence the decree should be for defendant. (a) Both the mortgagor and mortgagee testified that the mortgage was given to secure an actual bona-fide indebtedness of $30,000, and there was no evidence to the contrary. (b) Fraud must be established by evidence. Mere suspicion will not suffice. Waddingham v. Loker, 44 Mo. 132; Funkhouser v. Lay, 78 Mo. 462; Robinson v. Dryden, 118 Mo. 534; Bank v. Worthington, 145 Mo. 91; Crow v. Andrews, 24 Mo. App. 160. And must be proven beyond a reasonable doubt. Dallam v. Renshaw, 26 Mo. 544, by SCOTT, J. (c) The facts being as consistent with an honest as with a dishonest purpose, the presumption is against the allegation of fraud. Dallam v. Renshaw, 26 Mo. 544; Funkhouser v. Lay, 78 Mo. 462; Webb v. Darby, 94 Mo. 621; Ridge v. Greenwell, 53 Mo. App. 479. (d) The mortgagor had a perfect right to prefer his brother, even if by so doing nothing remained for other creditors. Wood v. Porter, 179 Mo. 56; Trebus v. Hender-

son, 180 Mo. 616.   (e)  Even if the purpose of the mortgagor was to defraud Black, and the mortgagee knew of that purpose, the mortgagee had a right to demand and receive the mortgage as security for a bona-fide debt then existing.   Dougherty v. Cooper, 77 Mo. 528; Rupe v. Alkire, 77 Mo. 641; Bank v. Gailey, 177 Mo. 181.   (4)  The evidence of August Gehner, a witness for plaintiff whose judgment of real estate values in St. Louis will not be questioned, shows that one piece of property covered by the mortgage was worth, in 1901, $35,000 or $5,000 more than the mortgage, and is increasing in value.   This with the Sidney street property is ample to satisfy plaintiff's demand—hence plaintiff is not injured by the mortgage. Bank v. Worthington, 145 Mo. 91.

*Chester H. Krum* and *Albert C. Davis* for respondent.

(1)  The court did not commit error in excluding answer to the question asked as to the reputation of Simon and Marcus Epstein.   (a)  No proper foundation was laid for the question, as it was not shown that the witness knew the reputation of the Epsteins. 5 Am. and Eng. Ency. Law (2 Ed.), 879.   (b)  Evidence of character is incompetent in a civil suit, unless by the pleadings it is brought in issue.   Ward v. Herndon, 5 Port. (Ala.) 382; Church v. Drummond, 7 Ind. 17; Gebhart v. Burkett, 57 Ind. 378; Simpson v. Westenberger, 28 Kan. 756; Dudley v. McCluer, 65 Mo. 241; Porter v. Seiler, 23 Pa. St. ·424; Gutzmiller v. Lackman, 23 Mo. 168; Stark v. Publishers, 160 Mo. 529.   (c)  A charge of fraud does not involve character.   Ward v. Herndon, supra; Paures v. Armstrong, 62 Ark. 267; Stow v. Converse, 8 Conn. 325; Ins. Co. v. Jachnicher, 110 Ind. 59; Simpson v. Westenberger, supra; Judge v. Webb, 6 Me. 14; Martin v.

Good, 14 Ind. 398; Haywood v. Reed, 4 Gray 574; Klein v. Bayer, 81 Mich. 233; Dudley v. McCluer, 65 Mo. 241; Vawter v. Hultz, 112 Mo. 633; Gordon v. Miller, 111 Mo. App. 342. (2) The depositions of defendants were admissible in evidence. Bogie v. Nolan, 96 Mo. 85; Kritzer v. Smith, 21 Mo. 296; Charleston v. Hunt, 27 Mo. 34; State ex rel. v. Bank, 80 Mo. 626; Pomeroy v. Benton, 77 Mo. 82. (3) Respondent has the right, if the deed of trust is without consideration and fraudulent and void, to sue to set the same aside regardless of the relative value of the ground to the amount of the deed of trust. Bank v. Doran, 109 Mo. 40; Lionberger v. Baker, 88 Mo. 447. (a) Gehner's testimony as to value was at best only a guess. (b) Simon Epstein testified both pieces of property were worth $29,000. How reliable he is, the record has abundantly shown. (4) The transcript not containing all the evidence introduced in the trial court and appellant's abstract being likewise deficient in omitting the written admissions of appellant, this court will affirm the judgment of the trial court. Vandeventer v. Gross, 190 Mo. 239; McCullough v. De-Witt, 163 Mo. 306; Doherty v. Noble, 138 Mo. 32; Wentzville Tobacco Co. v. Walker, 123 Mo. 670; Mitchell v. Mitchell, 191 Mo. 475; Bradley v. Bradley, 119 Mo. 58; Reed v. Peck, 163 Mo. 333. (5) The judgment should be affirmed upon the showing made by appellant. (a) The evidence did not create a suspicion; it proved actual fraud. (b) It is true that both the Epsteins testified that the deed of trust was given to secure a bona-fide indebtedness, but the record does not present the first case where interested parties have unblushingly falsified when testifying in their own behalf. (c) When an appellant is afraid to have his own evidence brought before the appellate court, it must be presumed that it was omitted because it was adverse.

FOX, J.—This action was begun on September 19, 1902, in the circuit court of the city of St. Louis by Maurice H. Black against Simon Epstein, Frank Heimenz and August Gehner. On November 4, 1903, an amended petition was filed by which Marcus Epstein was also made a party defendant.

The object of the action is to set aside a deed of trust made by Simon Epstein on January 8, 1901, to August Gehner, as trustee, and Frank Heimenz as party of the third part, to secure a note of $30,000, made to said Heimenz, which said note and deed of trust were transferred to the defendant, Marcus Epstein, on the grounds, as alleged, that said deed of trust was made to hinder, delay and defraud the plaintiff and other creditors of Simon Epstein, and to cover up and conceal the property of Simon Epstein from plaintiff and his other creditors. It is alleged that said deed of trust and the note of $30,000 secured thereby, were wholly without consideration; that Simon Epstein was not indebted to Heimenz, and that the assignment and transfer of said deed of trust and note from Heimenz to Marcus Epstein were wholly without consideration and made to hinder, delay and defraud the plaintiff, and to prevent him from collecting a just claim against defendant, Simon Epstein; it is also alleged that said deed of trust was conceived by Simon Epstein and Marcus Epstein for the purpose of covering up and concealing the ownership of the property of Simon Epstein, and to hinder, delay and defraud the plaintiff. Plaintiff prayed that said deed of trust be declared null and void as to plaintiff, and that the real estate therein described be subjected to the lien of certain judgments of plaintiff obtained against said Simon Epstein.

The answer was a general denial.

Judgment was rendered for plaintiff in accordance with the prayer of the petition on September 28,

1904. From this judgment Marcus Epstein appealed to this court.

The evidence developed upon the trial was substantially as follows: On August 16, 1900, respondent Black commenced an action in the circuit court of the city of St. Louis against Simon Epstein which resulted in a judgment in favor of Black and against said Epstein on February 4, 1901, in the sum of $3,171.73, with interest thereon from date of judgment at six per cent per annum. Afterwards Black began another action in said circuit court of the city of St. Louis against said Simon Epstein on another cause of action, which resulted in a judgment against said Epstein on June 20, 1902, in the sum of $3,490.56, with interest thereon from date of judgment at six per cent per annum. At the time of rendering judgment in this cause said two judgments amounted, with interest, to $7,710.10. At the time of the commencement of the above described two suits Simon Epstein was the owner of the real estate described in respondent's petition.

On the 8th day of January, 1901, Simon Epstein executed and delivered a deed of trust to August Gehner, as trustee, and Frank Heimenz, as party of the third part, which deed of trust was duly recorded in the office of the recorder of deeds in the city of St. Louis, on January 12, 1901. Said deed of trust purported to secure a note of $30,000 made to said Heimenz and embraced the real estate described in the petition. Immediately after said deed of trust and note were executed they were assigned and transferred by Heimenz to Marcus Epstein. It is conceded that no consideration of any kind passed from Heimenz to Simon Epstein, or from Marcus Epstein to Heimenz. It is also conceded that if there was any consideration moving the execution of said deed of trust and note it consisted of past debts owing by Simon Epstein to Marcus Epstein. The said deed of trust embraced

all the property of Simon Epstein, including personal property, and there remains no other property upon which executions might be levied or out of which said judgments could be satisfied.

Frank Heimenz testified that he was working for the Title Guaranty Trust Company when deed of trust was made; he had no recollection of the transaction. Simon Epstein did not owe him anything, nor was there any consideration passing from him to Simon Epstein, nor from Marcus Epstein to him for the note and deed of trust. He indorsed the note without recourse—that was the usual way of doing business in the office.

August Gehner testified. He was trustee in the deed of trust, but does not remember the circumstances of making the deed. Thinks that deed of trust was made at the instance of the Epsteins. Says it was a habit in his office to make all the deeds of trust to Heimenz or himself as trustee. Epstein was not indebted to Heimenz. Says he was not directed by Epstein to make the deed of trust in the form it was made, but that Epstein always left such matters to him and he followed his usual custom. He thinks one of the Epsteins told him that Simon owed Marcus $30,000. He knew nothing of any contemplated fraud when he drew the deed as he did. The practice has been for a long time to make deeds of trust to Heimenz and have him indorse the note without recourse. He had drawn many deeds of trust for Simon and Marcus Epstein and had drawn them in the same way. He had been placing loans for them for fifteen or twenty years. On a part of this property—that on the Clayton road—Simon Epstein had loaned $25,000, took a deed of trust and bought it in at a sale; that is how he got title. Says he originally made the loan for Simon on the property; says he could not tell value of property without looking at it, but supposed it worth $35,000.

Simon Epstein testified that he was born in Bohemia in 1848; went to St. Louis in 1866, where he has lived on Sidney street ever since at No. 225. His older brother, Marcus, was already there. He picked rags for two years, then went into the butcher business. Was in butcher business at Seventh and Spruce streets for eight years; then he went to Union Market. In 1876 he was worth about $1,000. Did business at Union Market for twenty-five years. From 1876 to 1890 he made about $10,000 and in 1890 he lost it all trusting his friends. Says he lost $17,000 by Joe Baum, a shoe man—just took his note without security. Baum is dead. Baum's bookkeeper knows he loaned Baum $17,000, but he does not know where the bookkeeper is. Baum got the money from him in "thousands and two thousands" as he could scrape it up. Says he got back about five thousand when Baum made an assignment. Says he loaned Baum this money in 1891. Says from 1891 to 1895 he had no bank account. Then follow these questions and answers: "Q. You never had a bank account? A. No, sir. Q. Did you ever have a bank account anywhere? A. Yes, sir, my brother. Q. Where? A. German American Bank. Q. In his name? A. No, sir, mine. When I was flat broke I had to use my brother's money, since 1891." From 1891 he says he did a butcher business at Union Market and that it only took a small amount of money—twenty-five dollars. Says that in 1888 he loaned $4,500 to Albert David in New York. David was a cousin of his wife. Loaned his money without security and he is now in Porto Rico. Then in answer to a question said the losses enumerated were all he made. Has not loaned money since except for his brother Marcus, who is a butcher on Soulard street. Further explaining his butcher business he said: "I buy a little meat in the morning and I stand there all day and sell it and in the evening I see what is there and what is

not there." Buys his meat for cash and has been doing so for eight years. Again says he lost his money trusting friends, and that he trusted everybody. Says that from 1890 to 1895 he sold meat to John Shaw on Fourteenth and Market streets and never got a cent for it. Shaw used from $200 to $300 worth of meat a week and every now and then stuck him with a bill, but he kept on selling him. Shaw is dead now. He never tried to collect the claim either before or after the death of Shaw. Says there are plenty of other dead men he lost money to. Says Shaw owed him $10,000 or $12,000. He had no books to show Shaw's account. He kept books, but "when a man is dead you don't need books." Says he began to borrow money from his brother in 1891, "in hundreds and two hundreds and five hundreds and thousands." His brother would buy cattle, take half and give him half and he was not able to pay for the half he got. Says a man by the name of John Geitz, a butcher, owed him $700 for meat; does not know where he is. Geitz left in 1895 and he has not seen him since. Charlie Williams, he thinks his name was, on 13th and Franklin avenue, owed him in 1897 $1,200, but he does not know where he is. He has no book record of this account. In 1898 a butcher by name of Wagner owed him $1,700, but he does not know where he is. Also Joe Weber owed him in 1896, about $700, but he does not know where he is. One Bill Smith owed him $900 in 1894, but he has never seen him since and does not know where he is. All these men who owed him were butchers to whom he had furnished meat after 1890. Says there were many others who owed him large amounts whose names he cannot remember. Says he had memoranda books showing all these accounts, but that he is not willing to produce them because he has not got them. Says he has no books showing any of these matters prior to 1897. He never sued on any of these accounts or placed them in the hands of a

collector. Never took any steps to trace these men and collect what they owed. This question was asked: "What did you do with that money that you began to borrow from him" (his brother)? and he answered, "Didn't I tell you I passed it out to butchers and around and did not get anything back?" Again, "Well, you say your brother bought the cattle and divided them with you? A. Yes, sir. Q. Well, you did not have to pay him for the cattle when you borrowed the money from your brother? A. No, sir. Q. Now what did you do with the money you borrowed from your brother? A. Trusted my friends. Q. You say you trusted your friends in meat? A. Yes, sir, and some other friends in money." He then testified that in 1900 he trusted I. M. Smith with about $9,000. He was a son-in-law of Simon. When asked how he gave him the money says Smith pulled his leg every day; says he was bound up to the butchers and he had to give them money, for he could not get money from them, and was getting deeper and deeper in with them; first said that this continued until 1898, and then remarked that it went on for two or three months; that he could not stand it any longer and the butchers could not pay; claims that from 1891 to 1895 he got in debt to his brother by buying cattle and meat from him which he could not pay for, and by borrowing money which he loaned to his friends who did not pay him back. When asked what he did with the money says he sometimes owed money and sometimes promised money to his friends and borrowed money for them; says that he had to have money to buy lambs and calves which he did not get from his brother, and that his brother furnished the money; that his business from 1891 to 1895 amounted to about a thousand dollars a week and his profits were about ten per cent; says he first began to get meat and borrow money in 1891, but he cannot remember how much he owed his brother during any year from that year up to 1899,

although he says they had very frequent settlements; in 1899 he says he owed his brother $32,000 and more; that the accounts were kept in a small book, but he does not know where the book is, and does not undertake to account for the absence of the book; that he knew once a month just how much he owed his brother, but could not give any amount except $32,000, which was due in 1899. Says his brother then wanted a deed of trust on the property on Clayton avenue to secure this debt; that he gave his brother the deed of trust in question in 1899, to secure a note of $30,000, drawing seven per cent interest; that he has not paid any interest, but has turned the property over to his brother, who pays the interest out of the rents; says he got this property on Clayton avenue in 1895 at a sale under a deed of trust to secure $25,000, which he had loaned to Michael Foerstel; that he had to buy it in to protect himself on the loan; that no one knew he was in debt to his brother; that it was a secret between them; says Michael Foerstel owed him $25,000 for cash advanced him; that he began to furnish him money in 1892 and 1893, and quit in 1895; and then he qualifies his statement by saying that the $25,000 loan was part meat and part cash—about half meat and half cash; that August Gehner was trustee in the Foerstel deed of trust and that he did not let Foerstel have any more money or meat after he gave him the mortgage; again says that between 1893 and the date of the deed of trust Foerstel got in debt to him for $25,000 in cash. He stated that the settlement between his brother and himself was made in 1900. Then questions were propounded and answered as follows: "Q. At the final settlement how long did it take you to make the settlement with your brother? A. How long it took to settle, do you mean? A. Yes? A. Well, we figured it up. Q. How long did it take you to figure it up? A. About a couple of days." Shortly afterwards in the course of his examination, these questions and

answers follow: "What time did you commence in the morning to make the settlement? A. We did not commence in the morning. Q. When did yon commence? A. In the evening. Q. What time in the evening did you commence? A. After supper. Q. How long did you work at it that night? A. We did not have to work on it long; he knew what I owed and I did too. Q. Then it took you about ten minutes did it? A. Oh, it took about half an hour." Further says that the note for $30,000 did not represent all he owed his brother at the time; that he owed him $1,700 more and gave him his promise that he would pay when he could; says that the property on Clayton avenue is worth twenty-five or twenty-six thousand dollars and that the property where he lives on Sidney street is worth three or four thousand dollars. Shortly after giving the deed of trust he says he turned over his butcher business at Union Market to his boys and as there was nothing there they paid him nothing. He then went to work for his boys who had been working for him before. Says his brother Marcus is married; that he lived with Marcus; says he and his brother were never in partnership in any kind of business. At the sale under the Foerstel deed of trust he had Mr. Gehner attend to it for him and buy it in for the amount of the debt.

The foregoing are extracts from the deposition of Simon Epstein. He was called to testify in his own behalf. He again stated that he had become indebted to his brother in 1891 when he borrowed money from him to give to Joe Baum and that the total amount he let Baum have was $17,000; he produced a note for $13,000 dated January 30, 1891, payable to Simon Epstein in six months after date and signed Joseph Baum & Company; says Baum is related to him; when asked how he came to loan money to Joe Baum and his company he answered, "He was some relation of mine." When asked what part of the $13,000 he got from his

brother he answered that he got the biggest part of it and that he could not remember any particular sum he got from his brother, except one of five thousand and one of five thousand three hundred, which he gave to Joe; also says he indorsed for Joe. The following questions were propounded and answered: "Q. Did you become indebted to your brother for borrowed money or for anything else? A. For borrowed money and for money took out of the business for cattle and meat." Being questioned further as the Foerstel property the following colloquy occurred: "Q. You got that the first time? A. I got that from Creditors Real Estate Company. Q. That was in 1893 that Foerstel failed? A. I could not remember the year. Q. After he failed he made an assignment for the benefit of his creditors? A. Yes sir, and we got back the property. Q. They took all the real estate? A. Yes, sir. Q. First, and then they afterwards deeded this particular piece of real estate to you? A. I wanted the property or money and they gave me the property. Q. At that time you had a deed of trust on that for how much? A. For $25,-000. Q. When did you put that deed of trust on that property? A. I believe some where in the 80's." Says that since 1891 he has had all kinds of losses, nothing but losses and family troubles; says his wife died in 1895 and that during her sickness he spent $3,000 on her, and that he also lost one of his boys and that since that time he was out eight or nine thousand dollars on account of Spitz, his son-in-law; that the notes held by respondent, Black, are notes indorsed by him for Spitz; says he gave his brother the deed of trust in question to secure $30,000, because he owed him that amount and because his brother asked him for it; says he and his brother have lived together in the same house since 1866; that he eats at his brother's table and occupies rooms separately from his brother's family; says he paid Black, the respondent,

$4,000 on the notes which he signed to him and that he got the money from his brother; that all the real estate he owned was the property on Sidney street and Clayton avenue and that it is all embraced in the deed of trust given to his brother.

The deposition of the defendant Marcus Epstein taken by plaintiff, was offered in evidence but is not called for or set out in the bill of exceptions. He, however, testified in his own behalf at the trial and his testimony in substance is as follows: That he is a brother of Simon Epstein, and that his brother gave him a deed of trust on the Clayton avenue and Sidney street property to secure $30,000; says his brother owed him more than that, and when asked when his brother first began to become indebted to him, he answered, "Since Joe Baum failed;" then adds that his brother got money from him to loan to Joe Baum; further he says that his brother borrowed money from him before he loaned Joe any. These questions and answers followed: "Q. What did he owe you for? A. Cash and meat. Q. How did he become indebted to you for meat? A. I gave him the meat. Q. Where did you get it? A. I bought cattle and killed them. Q. Did you keep an account of what he got? A. We counted it every week, or every day, or two weeks, or every two days." Also says he loaned him money to go into the Foerstel property, but he could not remember how much. These questions were asked and answered as follows: "Q. Something was said in this deposition about you loaning him about eighteen thousand dollars one time that you had in the house for ten months, how about that? A. I said ten minutes. Q. And there is something said about you having $18,000 in five dollar bills? A. There was $5,000 in five dollar bills." Says he got all that money for his brother, but does not know what he did with it. States that at the time the deed of trust was given for $30,000 his brother owed him $31,700; that he went

to see Gehner about the deed of trust, and when asked if he had given him any particulars about how to make it answered: ''No, sir; I told him the whole truth, that I had so much money with my brother and to make these papers and then we went up and he signed it; did not tell him to make it to Heimenz or Gehner or anyone, but I did not read these papers either because I cannot read English, I depended upon Gehner.'' Says he did not take the deed of trust for the purpose of defrauding Black.

This is a sufficient indication of the nature and character of the testimony upon which this cause was finally submitted to the chancellor for his consideration.

At the close of the evidence the cause was submitted to the court and its finding was in favor of the plaintiff. In accordance with such finding a decree and judgment was rendered setting aside and annulling the deed of trust involved in this proceeding. A timely motion for rehearing was filed and by the court taken up and overruled. The defendant, Marcus Epstein, from such judgment and decree, prosecuted his appeal and the record is now before us for consideration.

## OPINION.

The legal propositions disclosed by the record, which are presented to this court for consideration, may thus be briefly stated:

First. That the deposition of defendant, Simon Epstein, taken before Marcus Epstein was made a defendant, Simon being present in court at the trial, was erroneously read in evidence over the objection of appellant.

Second. That the trial court erred in refusing to allow the witness Gehner to testify to the good reputa-

tion of the Epsteins, the evidence not being in rebuttal of an attack on their character.

Third.    That this action cannot be maintained because the property described in the deed of trust far exceeds the debt, and that the surplus would more than satisfy the demands of respondent.

Fourth.    That Simon Epstein has a homestead right in the property and therefore this action cannot be maintained until such homestead is ascertained and set out.

Fifth.    That the evidence is insufficient to establish the main contention, to-wit, the fraudulent character of the deed of trust in question.

## I.

It will be observed that the deposition of Simon Epstein was taken by a commissioner appointed by the court before Marcus Epstein was made a party, and at the trial Simon was present.    The defendants entered an objection to the reading of Simon Epstein's deposition because he was present and ready to testify, and for the further reason that it was taken prior to the time when Marcus was made a party defendant.

In Priest v. Way, 87 Mo. 16, it was ruled that the deposition of a party to a cause may be read in evidence against him in another cause as an admission, but is not admissible nor should it be read in the same cause in which it is taken.    This conclusion of the court as announced was by a divided court.    In Bogie v. Nolan, 96 Mo. 85, this court was again confronted with the proposition now under discussion, and after a most thorough and careful consideration of all the authorities the case of Priest v. Way, supra, was overruled, and this court, speaking through Judge BRACE, very clearly announced the rule applicable to this proposition, and the learned judge announced the conclusion to be ''that the declarations of a party to a suit, made in a deposition taken by his adversary, may be read

in evidence against him on the trial, in the same suit in which such deposition was taken, whether he be present or absent; he is none the less a party because his adversary has called him as a witness; that the Legislature, in conferring upon a party the right to call upon his adversary to testify, and in providing means by deposition to procure the evidence of witnesses who might not be able to be in personal attendance upon the trial, did not intend to narrow the scope of the inquiry, for the very truth of the matter in controversy, by abrogating that ancient, well-recognized and hitherto unquestioned rule of evidence, that the declarations of a party to the suit may be given in evidence against him—a rule that hitherto has had no respect for time or place, always presuming that a man's statements as against himself are truthful, whether made in court or out of court, on oath or in casual conversation, orally or in writing. They all rest on the same principle, that a man is not apt to declare a fact against his own interest unless it be true. In principle, there can be no difference in the character of this evidence, whether the declarations are made in the deposition of a party taken in his own case then on trial, his deposition taken in another case to which he was a party, or taken as a witness in a case in which he was not a party and had no direct interest. They are admissible in each case for the same reason, not as the deposition of a witness under the statute, but as the declaration of a party to the suit."

This deposition of Simon Epstein was admissible for whatever it was worth to respondent as declarations touching the facts of the case, and this conclusion is simply in keeping with that well-recognized rule of evidence that any statements which may have been made by a party to a suit against his interest, touching material facts, are competent as original testimony. We are entirely satisfied with the reasoning

of the court in Bogie v. Nolan, supra, and have no disposition to depart from it.

It is urged that the statements of Simon made in his deposition were not binding on Marcus because he was not a party at the time the deposition was taken and therefore did not have the right of cross-examination. This deposition was offered simply as statements and declarations of Simon, and not as evidence against Marcus, or as declarations of one conspirator against another. Moreover, Simon testified for the defense at the trial and Marcus then had the opportunity of having him examined and to explain any statements in his deposition. But it is argued that respondent is bound by the statements of Simon Epstein, having made him a witness. The rule applicable to this proposition is that where one party calls the other as a witness he will not be allowed to directly impeach his credibility, but where the evidence of such witness is contradictory, tending to show that the witness is inclined to prevaricate and what he says is not strictly in accord with the truth, the court or jury will still be authorized to place the proper estimate on it. [Chandler v. Fleeman, 50 Mo. 239.] The respondent is not bound by the statement of Simon Epstein that he honestly owed his brother $30,000, if his evidence as a whole demonstrates that this statement was untrue.

## II.

It is next insisted that the circuit court committed error when it sustained an objection to a question propounded to August Gehner inquiring of him what the reputation of the Epsteins was for fair dealing. The questions propounded were: "Q. How long have you known the Epsteins? A. Fifteen or twenty years. Q. What is their reputation for fair dealing?" Objection to the last question was sustained. Appellant relies on the cases of O'Bryan v. O'Bryan, 13 Mo.

16; Miller v. Miller, 14 Mo. App. 418, and Greenleaf on Evidence, sec. 54. The two cases cited were divorce proceedings. In the O'Bryan case the defendant, who was charged with adultery, was permitted to show as original testimony that her reputation was good. But this and similar cases were not followed in Dudley v. McCluer, 65 Mo. 241. That was an action by which defendant was charged with false and fraudulent representations, and the circuit court allowed evidence of his good character to go in before any attempt was made to attack his character. The court said: "His character was not in issue. It is true he was charged in the petition with having made false and fraudulent representations, and the charge was calculated to affect his character indirectly, and so in every case where one is sued for a debt, and he denies it, or pleads payment, his character is somewhat involved in the investigation. Putting character in issue is a technical expression, which does not mean simply that character may be affected but that it is of particular importance in the suit itself, as the character of plaintiff in an action of slander, or that of a woman in a suit for seduction." The statement of Greenleaf that "generally in actions of tort, wherever the defendant is charged with fraud from circumstances, evidence of his general good character is admissible to repel it," the court says is not sustained by authority. In civil actions the character of neither party unless assailed can be inquired into if not put in issue in the nature of the proceedings. It is put in issue only in that class of cases such as libel, slander, malicious prosecutions, etc., in which evidence of good character is to be considered in assessing damages. [Vawter v. Hultz, 112 Mo. 633; Stark v. Pub. Knapp & Co., 160 Mo. 529.] The character of defendants Epstein for fair dealing was not put in

issue in this case, therefore the court properly sustained the objection.

Moreover, even if the inquiry had been pertinent, no foundation was layed for the question. Before a witness can be asked about the general reputation of a party, it must first be shown that the witness is acquainted with such reputation and knew it. [5 Am. and Eng. Ency. Law (2 Ed.), 879; State v. Cox, 67 Mo. 392.]

## III.

It is contended by appellant that the Clayton property was shown to be worth $35,000, and that in addition thereto he owned the Sidney Street property, and that therefore there was a surplus sufficient over and above the deed of trust out of which respondent could have made his judgments without resorting to this action. The only evidence tending to fix the value of the Clayton property at $35,000 was that given by the witness Gehner. In answer to a question he said he could not tell the value of the property, but supposed without looking at it that it ought to be worth $35,000. Simon Epstein put the value of the Clayton Avenue property at twenty-five or twenty-six thousand dollars, and the Sidney Street property at three or four thousand dollars. The evidence wholly fails to show that there was an excess value to this property out of which the judgments of respondent could have been made. The ruling upon this contention must be adverse to appellant.

## IV.

It is also contended by appellant, for the first time in his reply brief, that Simon Epstein was entitled to a homestead right in the property covered by the deed of trust, and that therefore this action could not be maintained until such homestead right had been ascertained and set out. He claims a home-

stead right as the head of a family, yet the evidence shows that his wife died in 1895, and wholly fails to show that since that time he had had a family of his own; in other words, there is no evidence showing that he 'was the head of a family.  Moreover, no claim of homestead was set up in the answer, nor was the question presented to the circuit court in any manner whatever.  A homestead right in the head of the family is an exemption right, which differs from a homestead of a widow and minor children, which is a vested estate.  We are fully satisfied that if Simon Epstein is entitled to homestead exemption in any of the property described in the deed of trust he has wholly failed to produce evidence showing such right, and his contention upon this proposition comes too late to justify further consideration by this court.

## V.

On the merits of this controversy appellant insists that the judgment should have been for the defendants, and requests this court to read the record carefully, and advances the hope that after so doing we will agree with him in the conclusion that the plaintiff has failed to prove any substantial fault or wrongdoing of the defendants.

Following the usual course of this court in such cases as this to review the evidence and render such judgment as it may seem to require, we have read in detail the evidence as contained in the bill of exceptions carefully and thoroughly, and will now proceed to announce the conclusions we have reached.

We are first asked by respondent to affirm the judgment because the deposition of Marcus Epstein which was taken in the cause was not set out in the bill of exceptions.  It is said in the case of Doherty v. Noble, 138 Mo. 25, that "the judgment must be affirmed for another reason.  It appears from an abstract of the record prepared by plaintiff that some

depositions and deeds were read in evidence by defendants on the trial which have been lost since the trial and are not contained in the abstract at all. Appellate courts review the evidence in equity cases and unless all of it or its substance is preserved in the record, we must act on the presumption that the trial court decided correctly. The omitted evidence may be controlling and we must assume that it was.'' The deposition of Marcus Epstein was offered, as the bill of exceptions discloses, in the following manner:

"MR. KRUM: I now offer and wish to read in evidence the deposition of Marcus Epstein.

"MR. WIND: We wish to make the same objection to the offering of this deposition as we did to the deposition of Simon Epstein.

"This objection being by the court overruled, the defendant excepted and at the time saved exceptions.''

This is all that occurs in the bill of exceptions relating to the deposition in question; whether it was read or not, does not appear.

Section 866, Revised Statutes 1899, as amended in 1903 (Laws 1903, p. 105), provides that it shall not be necessary that any written or printed matter offered in evidence upon the trial and properly identified and deposited with the clerk, shall be copied or set forth in the bill of exceptions, provided such bill contains a direction to the clerk to copy same. No direction to the clerk appears in the bill of exceptions. It was certainly as much the duty of the respondent to see that the bill of exceptions contained the necessary calls as it was that of the appellant. The bill of exceptions was marked "O. K." by Mr. Krum, one of the attorneys for respondent. The presumption is that he inspected the bill carefully before doing so. We are not disposed under the circumstances to affirm this cause because of the failure to

set out the deposition of Marcus Epstein in the bill of exceptions.

Respondent contends that the evidence shows, and the circuit court so held, that the deed of trust dated the 8th day of January, 1901, from Simon Epstein to August Gehner, as trustee, and Frank Heimenz as party of the third part, and afterwards transferred by Heimenz to Marcus Epstein, was without consideration, fraudulent, and made to cover up and conceal the ownership of the property therein described, thereby hindering, delaying and defrauding the respondent. That there was no consideration for this deed of trust passing from Heimenz to Simon Epstein, nor from Marcus Epstein to Heimenz, is conceded. Whether or not the said deed of trust was fraudulent in the manner alleged in the petition, depends largely, in fact almost entirely, upon the proper analysis of the evidence of Simon and Marcus Epstein. Beyond the deed of trust and judgments offered by respondent there was very little evidence of any consequence outside of that given by the Epsteins.

A debtor, whether solvent or insolvent, may prefer one or more of his creditors, and may by any suitable means appropriate his property to the payment, or part payment, of the just debts of one or more of his creditors to the exclusion of others. [Wood v. Porter, 179 Mo. 56.]

The relationship of the parties and the insolvency of the grantor are not sufficient in themselves to establish fraud, but these when added to other suspicious circumstances, may often furnish satisfactory evidence of fraud. [Robinson v. Dryden, 118 Mo. 534.] Therefore, the fact standing alone that the Epsteins were brothers, does not render the transaction between them fraudulent. If Simon Epstein was indebted to his brother Marcus in the bona-fide sum of $30,000, he had the right to prefer him as much as any other creditor.

It is said that fraud can rarely be proven by direct evidence and is most frequently deduced from the circumstances surrounding transactions between parties. Mere suspicion is not sufficient. Fraud must be proved as an affirmative fact, and the proof must be of such character as to convince the mind of the chancellor, for it is never presumed, and if the facts all consist as well with honesty as with fraud the transaction must be held honest. [Bank v. Worthington, 145 Mo. 91; Waddingham's Exrs. v. Loker, 44 Mo. 132.]

We have been unable to find any case where fraudulent transactions and the method of detecting them are more appropriately and clearly described than by Justice DeWitt in the case of Merchants' Bank v. Greenhood, 16 Mont. l. c. 429, where it is said: "Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know 'whence it cometh and wither it goeth.' It 'loveth darkness rather than light, because its deeds are evil.' It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination before we know that it has started upon its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial, perhaps, but in their mass 'confirmation strong as proofs of holy writ.' The weight of isolated items tending to show fraud may be 'as light as the shadow of drifting snow,' but the drifting snow in time makes the drift, the avalanch, the glacier. Fraud may hang over the history of the acts of a man like the leaden-hued atmosphere upon the house of Usher, 'faintly discernible but pesti-

lent,' an atmosphere which has no affinity with the air of heaven.''

According to the testimony of Simon Epstein, he came to the city of St. Louis in 1866 and followed the business of picking rags until about 1876, when he was worth one thousand dollars; then he went into the butcher business and continued in the butcher business for twenty-five years; up to 1891 he claims he made about $10,000, and yet during that time, according to his statements, he loaned out and lost between fifty and seventy-five thousand dollars. He stated positively that he began first to owe his brother in 1891, yet afterward stated that much of the money he had loaned prior to that time was his brother's money; that he began to borrow money from his brother in 1891 and also to owe him for meat, and yet they both testified that they had frequent settlements every month or two months, yet neither of them were able to state any amount for any year which was due; neither were able to produce any books or memoranda, although both claimed such book or memoranda were kept. Simon Epstein named some eight or ten persons who owed him large amounts, ranging from $700 to $10,000, for money loaned and meat furnished, yet all these persons were either dead or gone and he had never made any effort whatever to collect his bills for the amounts owing him; also claimed that many other persons owed him large amounts whose names he did not remember. While he says he kept an account of these loans he was wholly unable to produce any books or notes, except a note given by Joe Baum and one by Albert David. It is a significant fact that most of the loans made by him were to persons related to him or his family. Both the Epsteins testified that they lived together in the same house since the year 1866, and as one family, yet they say they never were partners in business. August Gehner testified

that he had been loaning money for both Simon and Marcus Epstein for fifteen or twenty years. It is quite evident that both the Epsteins were prosperous, enterprising business men, and were especially very successful as butchers. It is unreasonable to believe that such men would squander or give away money or property in the manner detailed by them, without making an effort to collect any portion of it. According to their testimony, Simon, from 1891 to time of making of the deed of trust, did not repay to Marcus any portion of these loans; any way why the full amount of $31,700 was not embraced in the deed of trust is not explained by either of them. In fact the testimony of both the Epsteins cannot be reconciled with truth and honesty, and is replete with contradictory and absolutely incredible statements, so unreasonable as to be beyond the belief of the impartial mind. No bank account of any consequence was kept by the Epsteins, and yet Marcus said in his deposition that he had $18,000 in the house at one time for ten days, and then at the trial qualified the statement by making it ten minutes. In his deposition he stated that he had $18,000 in five dollar bills, and at the trial undertook to say that he meant $5,000 in five dollar bills, and then added that he got this money for his brother. Marcus claimed that he did not know what his brother wanted with the money. Simon accounted for the money by saying that he let his friends have it and paid debts. The manner of making the note for $30,000 and deed of trust strikes the ordinary mind as being unusual. The fact that they were originally made to Heimenz and then transferred to Marcus Epstein by him, both transactions being without any consideration, is accounted for alone by a custom which prevailed in Gehner's office. To the impartial mind it resembles very much a part of a scheme to defraud. The record of the deed of trust did not disclose a loan from Marcus Epstein to Simon Epstein, but gave

notice to respondent and other creditors of Simon that Heimenz had loaned him $30,000. Gehner testified that he had been loaning money for the Epsteins in this manner for fifteen or twenty years. How many notes and deeds of trust were held by them at the time of the trial was not disclosed by the testimony, and under this system of loaning would not be disclosed by the deed records. We cannot regard these circumstances other than as transactions which indicate fraud.

Simon Epstein owed respondent two notes, or rather had signed said notes with his son-in-law, Spitz. Respondent insisted on having his money and brought suits on both notes. At this time (in the fall of 1900), the property described in the petition stood in the name of Simon and was clear of liens. After the suits were brought and before judgment in either case, the deed of trust in question was placed on record. According to the claim of the Epsteins this debt had been accumulating for nearly ten years, yet no effort was made to ascertain the exact amount or secure it by note or otherwise until judgments of respondent were impending. It is a significant circumstance that the deed of trust embraced all of Simon's real property as well as other property, including "fixtures, furniture and all other property, personal or otherwise, situate on, in or about said last described property— or belonging to or appertaining thereto." If the excess value of Simon's property over the deed of trust was sufficient to satisfy respondent's judgment then why include not only all his real estate in said deed of trust, but his personal property as well? Just about the time the deed of trust was made Simon turned over his butcher business to his boys, put his real estate, household furniture, etc., in the possession of his brother to collect rents and pay interest, thus completely stripping himself of property or effects of all kinds. These actions, in conjunction with the inti-

mate relations existing between Simon and Marcus prior thereto, together with their contradictory, unsatisfactory and unreasonable stories of their business transactions, their manner of dealing with each other and with their relatives, friends and others, impel us to the conclusion that the said note for $30,000 and the deed of trust made to secure same were without consideration and were conceived by Simon Epstein and Marcus Epstein for the purpose of covering up and concealing the ownership of the property of Simon, and for the purpose of hindering, delaying and defrauding the respondent.

Fraudulent schemes are usually discovered for the first time in some culminating transactions. As said by Judge DeWITT, "it is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination than before we know that it has started on its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from beginning to end." Thus in this case, the fraudulent scheme of the two Epsteins culminated and reached its destination in placing of record the deed of trust to Heimenz. The searchlight of this investigation has gone back over the trail of the dealing of these brothers for many years past and has lightened it from beginning to end.

We have given expression to our views upon the legal propositions as disclosed by the record, and have fully reviewed the evidence upon which the judgment and decree is predicated. The decree and judgment rendered in the trial court is fully supported by the evidence developed upon the trial; hence it follows that the judgment of the trial court should be affirmed, and it is so ordered.

All concur.