JOHN KENNISH, Respondent, v. CHAS. G. SAFFORD and ISAAC W. RAY, Appellants.

Kansas City Court of Appeals, March 6, 1916.

FRAUD AND DECEIT: Conspiracy: Proof.   While the difficulty of proving fraud does not dispense with the necessity of proof, and while merely suspicious facts and circumstances will not be accepted as legal proof, wide latitude is given as seemingly indifferent things without sinister significance when taken separately, may when properly dovetailed together, establish fraud.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

AFFIRMED.

*McCune, Harding, Brown & Murphy* for appellants.

*T. A. Witten* and *Hadley, Cooper & Neel* for respondent.

JOHNSON, J.—June 18, 1910, plaintiff (who then was practicing law in Kansas City) loaned $3650 to A. W. Howell, a building contractor, and took Howell's promissory note for that sum, due in ninety days with interest from date at eight per cent per annum. As collateral security Howell at the same time delivered or caused to be delivered to plaintiff three other promissory notes which purported to be secured by deeds of trust on real estate—one for $4000, one for $1800, and the third for $1500, in all $7300—twice the amount loaned to Howell. One of these collateral notes turned out to be a forgery and the other two were worthless. Howell who had been operating as a building contractor on an extensive scale was guilty of this and other criminal deeds and his affairs came to a crisis shortly before the maturity of his note to plaintiff. A receiver of his property was appointed but nothing was realized for creditors. The defendant Safford, a loan broker, procured the loan from plaintiff for Howell and a part of the proceeds were paid over to defendant Ray who was Safford's father-in-law and a creditor of Howell. Plaintiff charges a conspiracy between Safford and Ray to defraud him. The petition alleges "to induce plaintiff to make said loan, said defendant Safford for the purpose of carrying out said conspiracy to defraud plaintiff, represented that all of said notes (meaning the three collateral notes) were the property of said

Arthur M. Howell; that the same were all secured by deeds of trust on real estate in Kansas City, Missouri, which deeds of trust constituted and were first liens on the properties respectively described therein; that he knew said notes and deeds of trust to be good, valid, bona fide, and in full force and effect, and that he knew the titles to all of said real estate were good; that said real estate was ample in value to secure said notes; and that said Howell desired to make said proposed loan in order to complete an apartment building owned by him then in course of construction.

That said representations were all fraudulent and false and were at the time known by both of said defendants to be fraudulent and false, and were made by said Safford with the full knowledge of said Ray in carrying out said conspiracy and fraudulent scheme and design of said Safford and said Ray to defraud plaintiff.

That in truth and in fact said eighteen hundred (1800) dollar note and the deed of trust purporting to secure same were forgeries and were not executed by said Benjamin S. Fauber and Melvina F. Fauber, and the deeds of trust purporting to secure said four thousand (4000) dollar note and said fifteen hundred (1500) dollar note were subject to prior deeds of trust on the real estate in said deeds described and said real estate had been sold under said prior deeds of trust, and said securities were wholly worthless, all of which both said Safford and said Ray fully knew at the time.

That said loan was, in fact, applied for by said defendants for the said Howell for the fraudulent purpose of obtaining the proposed loan from plaintiff for said defendants' own use.

That relying upon the friendly intentions of said Safford and upon his well-known financial ability, and believing the representations so made by him, and that defendants were not personally interested in said loan,

plaintiff agreed to make said loan of thirty-six hundred and fifty (3650) dollars to said A. M. Howell, and did pay and deliver said sum to said Safford as agent for said A. M. Howell, and accept from said Safford the aforesaid notes alleged to be secured as aforesaid, as collateral security therefor. That said A. M. Howell was at the time wholly insolvent and financially worthless, all of which both said Safford and said Ray at the time knew, but which plaintiff did not know, and that said Howell soon thereafter became a fugitive from justice and is now insolvent and a fugitive.''

The answer is a general denial. The verdict of the jury was for plaintiff for $3650, the full amount of his demand and defendant Ray appealed. His principal contention is that the judgment against him lacks the support of any substantial evidence and that his demurrer to the evidence should have been sustained. The business of defendant Safford was conducted under the name of Farmers Mortgage & Loan Company. His father-in-law Ray, a wealthy man, lived near Kansas City and made the office of that company his headquarters but had no interest in the business. Some time before the events in controversy he had allowed Safford to lend some money for him and Safford loaned about $2900 to Howell, who was one of his regular customers. This loan was secured by two, and perhaps all three, of the collateral notes afterward turned over to plaintiff. Defendants deny having had possession of the forged note, but the evidence as a whole supports an inference that Ray received and held that note as a part of the security for his loan to Howell.

The major part of that loan was not due at the time plaintiff made his loan to Howell, but there is evidence tending to show that Safford, on behalf of Ray, was vigorously pressing Howell for instant payment and was moved to take that course by knowledge of the fact that the collateral notes were worthless and that

Howell had been borrowing money on spurious collateral. A bank recently had forced Howell to make good some paper of that character and a woman stenographer employed in Safford's office testified to hearing Safford demand of Howell that he repay the Ray loan within an hour. Defendant's evidence contradicts her testimony and attacks her credibility but we regard the issues it raises as issues of fact for the jury to determine. Safford and Ray both admit they were trying to collect the loan but say the effort was prompted by the desire of Ray to use the money in the purchase of lands in Colorado as gifts to his grandchildren. Defendants deny any knowledge of the insolvency or criminal practices of Howell and their evidence tends to show that they manifested confidence in him by lending him money after plaintiff made his loan.

Plaintiff had become acquainted with Safford at Jefferson City while plaintiff was assistant attorney-general. Safford was introduced by Fred Burkhart who had lived in Mound City where plaintiff practiced law many years. Burkhart was associated in business with Safford at Kansas City and when plaintiff retired from public office and opened a law office in Kansas City, Burkhart and Safford were among the first to visit him and Safford employed him in an important suit in Callaway county and informed plaintiff that he expected to employ him in all of his legal business, which was large. An intimate personal relationship was established between plaintiff and Safford, the details of which need not be recounted.

About the time Safford began pressing Howell for payment of the Ray loan, plaintiff sold a farm he owned in Arkansas and consulted Safford about the investment of the proceeds in a home in Kansas City. Afterward Burkhart called at plaintiff's office and in the ensuing conversation inquired if plaintiff knew Howell and receiving a negative answer remarked "he

is a good man to get acquainted with. He has a great deal of business here and he can throw you a lot of business and I would like you to get acquainted with him.'' Several days later Safford visited plaintiff and asked if he would like to make a loan. Plaintiff replied ''No''—that he desired to buy a home with his money. Safford said he had a good customer who needed some money for building purposes and he would consider it an accommodation to him if plaintiff would make the loan since he did not like to risk losing so good a patron. He told plaintiff that Howell was the customer and that a loan for ninety days would suffice. He spoke of the security as consisting of the three collateral notes we have mentioned and the indorsement of Ray which, of itself, the evidence shows, would have been ample security.

The amount of the three notes was double the amount Howell wished to borrow and Safford represented that each note was secured by real estate, the value of which was double the amount of the note. Plaintiff finally consented to make the loan, though not at the first interview. He told Safford that he knew nothing about values of city property and that he would not take the time or pains to inform himself about the value of the security or the titles to the land. There were three large abstracts of title and plaintiff said he would not go through them for the interest on the loan which would not exceed seventy dollars. In short plaintiff (so he states) made plain the fact that he was relying entirely upon Safford as his friend and client to give him the represented security and to attend to closing the loan. This is denied by defendants and their evidence is to the effect that Safford dealt at arm's length with plaintiff who, himself, investigated both the values of the security and the titles to the real estate.

Before the transaction was closed Safford informed plaintiff that he had investigated the collateral

and knew it was "gilt edge" and suggested that it was not necessary to have Ray indorse the note of Howell. Relying on these representations plaintiff accepted Howell's note for $3650 with the collateral notes as security and at the request of Safford drew two checks payable to the order of Howell one for $2900, and the other for $750, and delivered them to Safford. The check for $750 was turned over to Howell who received the money on it and the $2900 check was indorsed by Howell and deposited in bank to the credit of Safford. Howell and Safford then went to the office of the latter where they had a settlement with Ray. Safford was given $1000, it is claimed by defendants as a loan from Ray to defray the expenses of a trip to Colorado for the health of Mrs. Safford who was ill with pulmonary tuberculosis and afterward died from that disease. There is no doubt about Safford receiving that sum out of the proceeds of plaintiff's loan but there is a reasonable question as to whether it was a loan from Ray or Safford's share of the spoils of fraud successfully practiced on plaintiff.

Furthermore it is claimed by defendants that Ray still having full confidence in Howell loaned him $800 out of the proceeds on finding that he had no immediate need of the money for his intended purchase of land for his grandchildren, but the jury were entitled to infer from all the facts and circumstances in evidence that the loan of $800 to Howell, as well as the intention of Ray to purchase land, was mythical. We are not intimating that the proof of defendants on all these issues was not substantial, but in ruling on the demurrer to the evidence we must draw every legitimate inference in favor of plaintiff which evidentiary facts and circumstances will permit.

After the transaction was closed Safford, aided by Burkhart, repeatedly urged, and finally prevailed on, plaintiff to accept one-third of a commission of $75

they claimed Safford had collected from Howell and when the exposure of Howell came Burkhart threatened plaintiff with the consequences of having exacted usury in the acceptance of this part of the commission.

It is not seriously contended that plaintiff's evidence does not sustain the charge that Safford was a party to and one of the active instruments in the perpetration of a conspiracy to defraud plaintiff, but it is strenuously insisted that Ray appears rather as a victim than a partner in the conspiracy to which Safford and Howell were the parties. Plaintiff states that he had no knowledge that Ray was a creditor of Howell; that he was lending $3650 on the same collateral Ray had taken as security for his loan of $2900, or that Ray was to be paid out of the proceeds of his loan. If Ray was a party to the conspiracy he remained carefully concealed in the background and the conclusion that he was not a dupe of Howell and Safford but was their guilty partner must be drawn, if at all, from a mass of circumstances, none of which, standing alone, would support such conclusion, or suffice to do more than raise a mere suspicion. It is seldom that fraud may be proved by direct evidence. Secrecy is of its very essence, and if circumstantial evidence would not suffice to expose it there would be few instances indeed in which justice could not be defeated. While the difficulty of proving fraud does not dispense with the necessity of proof and while merely suspicious facts and circumstances will not be accepted as legal proof which must consist of more than insinuation and *innuendo,* the courts, as is well observed in Bank v. Hutton, 224 Mo. l. c. 71, et seq., are solicitous in such cases, realizing that fraud "is commonly deeply hid away  . . . can only be got at by inference. . . . Therefore they permit a minute search and a wide one in pursuit of fraud; for it may now and then be seen through a

small crevice, and seemingly indifferent things, without sinister significance when taken separately, may, when properly dovetailed together, establish fraud. Courts are fond of saying so much as that. [Black v. Epstein, 221 Mo. 286; State ex inf. v. Standard Oil Co., 194 Mo. l. c. 154 et seq.; St. Francis Mill Co. v. Sugg, 206 Mo. l. c. 155.]''

Where all the evidentiary facts and circumstances when properly pieced together enable the judicial eye to see through the outer covering to a dark and false interior, the showing will be deemed sufficient for all practical remedial purposes, though the cover be never so fair. [See, also, Mosby v. Commission Co., 91 Mo. App. l. c. 507; Allen v. Forsythe, 160 Mo. App. l. c. 269; Summers v. Keller, 152 Mo. App. l. c. 639.]

Of course if Ray, in good faith, was trying to collect a debt due him and accepted payment or partial payment without knowledge that Howell had fraudulently procured the money he could not be deemed culpable in any degree though the money had been secured by means of a fraudulent conspiracy between Howell and Safford. But the evidence of plaintiff does not leave Ray in such secure position. There is ample proof that with knowledge that he had been victimized and held paper that had no value Ray set his son-in-law Safford to work to save what he could from the wreck by fair means or foul, and that when he surrendered his worthless collateral and received payment in return, he knew that plaintiff had been deceived into parting with his money by trickery and fraud. There is much in his own testimony that the jury were entitled to reject as untrue. For example his assertion that he had no thought that anything was wrong with his paper and was trying to collect what Howell owed him before it was due, for the purpose of buying gifts for his grandchildren, is not very plausible in the light of all the attending circumstances and would justify

an inference that the story about the intended gifts was used to cover up the fact that he was trying to scramble to a place of safety before the explosion in his debtor's affairs occurred.

We hold that the evidence in its aspect most favorable to plaintiff accuses Ray of participation in the conspiracy. Since the testimony of plaintiff is to the effect that Safford entered into a sort of confidential relationship with him with respect to the loan in which he undertook to see that plaintiff received the represented security and that he knew plaintiff intended to rely upon his representations and not make any investigations for himself, defendants are in no position to say that plaintiff's own neglect to examine the abstracts and make independent investigations into the nature and value of the security was the proximate cause of his loss. As he said to Safford, the amount of the interest on the loan would not justify him in expending the professional effort an examination of the abstracts would entail. He had a right to say "I will not make the loan if I have to go to any trouble to investigate the security and if I make it I shall rely entirely upon your representations both as to title and values." If such were the understanding, neither Safford nor his codefendant Ray will be heard to say that plaintiff should not have reposed such confidence in Safford. [Judd v. Walker, 215 Mo. 312.] The demurrer to the evidence was properly overruled.

The second instruction given at the request of plaintiff is challenged on the ground of broadening the issues tendered in the petition. The theory of this instruction is that plaintiff would be entitled to recover as against Ray even under the hypothesis that Ray did not join the conspiracy at first and did not know of the fraud until after plaintiff had parted with his money but before Ray received a portion of the proceeds of the fraud.

The principle of law thus applied cannot be gainsaid. If a conspiracy exists a party who joins at any stage of the operation becomes a party to, and answerable for, all acts done by each and all of the conspirators before or afterwards in furtherance of the common design. [State ex rel. v. Ice Co., 246 Mo. l. c. 216; Greenleaf on Evidence (17 Ed.), sec. 184a; 8 Cyc. 658.]

The charge in the petition against Ray is that the fraudulent representations of Safford were made "with the full knowledge of said Ray in carrying out said conspiracy." This language would appear broad enough to include the act of joining at the last stage of the action, but if not susceptible of such construction, we hold a charge that one entered, and remained in, a conspiracy is broad enough to include, not only the act of coming in at the beginning, but also that of entering at any subsequent stage. The logic of the rule we have just discussed supports this view, since the reason for holding a late comer responsible for all the preceding acts of his co-conspirators would apply with equal force to sustain the rule that an allegation that A and B conspired to defraud is supported by proof that B joined in a fraudulent scheme of A which had progressed successfully and afterward shared in its spoils.

What we have said answers the objection to the second instruction and the further suggestion that Ray should not be held responsible beyond the money he actually received from the proceeds of plaintiff's loan. There is no substantial error in the record and the judgment is affirmed. All concur.